**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION<br><br>　　　　Plaintiff,<br><br>v.<br><br>JAMES VORLEY and CEDRIC CHANU,<br><br>　　　　Defendants, | **CIVIL ACTION NO: 18-cv-00603**<br><br>**Hon._____**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY
PENALTIES AND OTHER EQUITABLE RELIEF**

Plaintiff Commodity Futures Trading Commission ("CFTC") alleges as follows:

**I. SUMMARY**

1.　　Beginning in at least May 2008 and continuing through at least July 2013 (the "Relevant Period"), Defendants James Vorley ("Vorley") and Cedric Chanu ("Chanu") engaged in a manipulative and deceptive scheme (the "Scheme") while placing orders and trading in the precious metals futures markets on a registered entity. Specifically, in furtherance of the Scheme, Vorley and Chanu repeatedly engaged in manipulative or deceptive acts and practices by "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution). On numerous occasions, Vorley and/or Chanu placed orders for COMEX gold, silver, platinum or palladium futures contracts that they wanted to get filled (the "Genuine Order") and entered orders for the same contract on the opposite side of the market that they intended to cancel before execution (the "Spoof Order"). In placing these Spoof Orders, Defendants Vorley and

Chanu intentionally or recklessly sent false signals of increased supply or demand to trick market participants into executing against the orders Vorley and Chanu wanted to get filled.

2. By virtue of this conduct, as further alleged herein, from approximately July 2011 through at least July 2013, Defendants Vorley and Chanu engaged in acts and practices that violated Section 4c(a)(5)(C) of Commodity Exchange Act ("Act"), 7 U.S.C. § 6c(a)(5)(C) (2012).

3. By virtue of this conduct, as further alleged herein, from approximately August 2011 through at least July 2013, Defendants Vorley and Chanu engaged in acts and practices that violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012) and Commission Regulation ("Regulation") 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2017).

4. Plaintiff brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), to enjoin Vorley's and Chanu's violative acts and practices and to compel Vorley's and Chanu's compliance with the Act. In addition, Plaintiff seeks civil monetary penalties and such other equitable relief, including but not limited to disgorgement, as this Court deems necessary and appropriate.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345, which provides that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress. Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

6. Venue properly lies with this Court, pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Vorley and Chanu transacted business in this District, or the acts and practices in violation of the Act have occurred within this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c)(3).

### III. PARTIES

7. **Plaintiff Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and Regulations promulgated thereunder.

8. **Defendant James Vorley** was employed by Bank A as a trader from at least 2008 to March 2015. For the duration of this time period, Vorley was employed as a trader on the precious metals desk in London at Bank A. Vorley has never been registered with the Commission. Vorley is a U.K. national domiciled in the U.K.

9. **Defendant Cedric Chanu** was employed by Bank A as a trader from at least 2008 to December 2013. From at least 2008 to May 2011, Chanu was employed as a trader on the precious metals desk in London at Bank A. In May 2011, Chanu moved to the precious metals desk in Singapore at Bank A, where he remained a trader until December 2013. Chanu has never been registered with the Commission. Chanu is a French national domiciled in the United Arab Emirates.

### IV. FACTS

A. <u>Market Fundamentals</u>

10. A **Futures Contract** is an agreement to purchase or sell a commodity for delivery or cash settlement in the future at a specified price. A futures contract traded on an exchange has standard, non-negotiable contract specifications.

3

11. An "**Order**," in the context of electronic exchange trading, is a request submitted to an exchange to buy (that is, "bid") or sell (that is, "offer" or "ask") a certain number of a specified futures contract. An order is for one or more contracts. Contracts may also be called "lots," among other things. Orders are entered into the exchange's Order Book. When one or more contracts in an order are bought or sold, that is a "fill" (or a "trade" or "execution"). At any time before the order is fully filled, the trader can "cancel" the order. When an order is cancelled, the contracts that have not yet been bought or sold are pulled from the Order Book.

12. An "**Iceberg Order**" is a type of order that traders could place on an exchange. In an Iceberg Order, the total amount of the order was divided into a visible portion of a certain pre-set quantity that was visible to other market participants, and a portion of the order, i.e. the remainder of the order, that was not. Whenever the visible portion of the order was filled, the same, pre-set quantity of the remaining, hidden portion automatically became visible; this process repeated until the entire order was either executed or cancelled.

13. When a "buy" or "sell" order is submitted to an exchange's electronic trading system, the order becomes part of the **Order Book**. In the Order Book, each trader can view the aggregate number of contracts that all traders are actively bidding or offering at a given price level. The best-bid level, or first-bid level, is the highest price at which someone is willing to buy. The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell. The bid-ask spread is the difference between those two prices.

14. Traders can view the aggregate contracts and orders up to the tenth-bid and tenth-ask levels. This combined bid and ask information is often referred to as the visible order book and represents the visible market depth. Traders often rely on information in the order book to make trading decisions.

15. **Order Book Balance** refers to the numeric relationship between the number of pending visible contracts offered and the number of pending visible contracts bid. Many market participants rely on the information contained in the Order Book and consider it when making trading decisions. For instance, if the aggregate size and number of sell orders significantly outweighs the total aggregate size and number of buy orders, market participants may believe that the Order Book Balance indicates that supply is exceeding demand and a price drop is imminent. Accordingly, they may decide to place orders to sell.

16. **Commodity Exchange, Inc. ("COMEX")** is a futures exchange located in New York, New York. COMEX is a designated contract market for trading futures and options under the Act. COMEX is owned and operated by CME Group, Inc. ("CME Group"), which is financial and commodity derivatives exchange based in Chicago, Illinois. CME Group's COMEX lists for trading gold futures, silver futures and other precious metals contracts.

17. **New York Mercantile Exchange ("NYMEX")** is a futures exchange located in New York, New York. NYMEX is a designated contract market for trading futures and options under the Act. NYMEX is owned and operated by CME Group. NYMEX lists for trading in platinum futures, palladium futures and other precious metals contracts.

18. **Globex** is CME's electronic trading system, located in the Northern District of Illinois.

19. **COMEX Gold Contract** is regularly traded on Globex for delivery during the current calendar month, the next two calendar months, any February, April, August, and October falling within a 23-month period, and any June and December falling within a 72-month period beginning with the current month. One contract unit is equal to 100 troy ounces. The COMEX Gold Contract is generally referred to herein as "Gold Futures."

20.     **COMEX Silver Contract** is regularly traded on Globex for delivery during the current calendar month, the next two calendar months, any January, March, May, and September falling within a 23-month period, and any July and December falling within a 60-month period beginning with the current month. One contract unit is equal to 5,000 troy ounces. The COMEX Silver Contract is generally referred to herein as "Silver Futures."

21.     **NYMEX Platinum Contract** is regularly traded on Globex for delivery during the current calendar month, the next two calendar months, and any March, June, September, and December within a 15-month period beginning with the current month. One contract unit is equal to 50 troy ounces. The NYMEX Platinum Contract is generally referred to herein as "Platinum Futures."

22.     **NYMEX Palladium Contract** is regularly traded on Globex for delivery during the current calendar month, the next two calendar months, and any March, June, September, and December falling within a 15-month period beginning with the current month. One contract unit is equal to 100 troy ounces. The NYMEX Palladium Contract is generally referred to herein as "Palladium Futures."

23.     **Tick** refers to the minimum price fluctuation for a particular futures contract. The minimum price fluctuation for Gold Futures is $.10 per troy ounce. The minimum price fluctuation for Silver Futures is $.005 per troy ounce.

24.     Globex's matching algorithm applies a First-In-First-Out ("FIFO") principle to orders at the same level of the Order Book. For example, if there are multiple orders sitting at the level of the best bid, and an offer is then placed at that same level, the bids will be filled in the order that they were placed. Modifications to price or quantity will move the order to the back of the queue.

**B. Vorley And Chanu Engaged In A Manipulative And Deceptive Scheme By Spoofing, And Taught A Subordinate How To Spoof**

25.     During the Relevant Period, Bank A, together with its subsidiaries and affiliates, was one of the largest global banking and financial services companies in the world. Bank A had operations in the United States and around the world. Bank A operated a global commodities trading business that included the trading of precious metals futures contracts. Bank A's primary precious metals futures trading desks were located in Singapore, London and New York.

26.     During the Relevant Period, Vorley and Chanu engaged in the Scheme, which followed the general pattern set forth herein. Vorley and Chanu, both individually and in coordination with each other and other traders at Bank A, manually placed Spoof Orders for precious metals futures contracts with the CME through Globex, which they intended to cancel before execution, opposite Genuine Orders for precious metals futures contracts, which they desired to execute. Typically, the Genuine Orders were Iceberg Orders and the Spoof Orders were not. For example, Vorley and Chanu would enter Genuine Orders as Iceberg Orders with small quantities visible to the market, and within a short time thereafter, placed visibly larger Spoof Orders on the other side of the Order Book. Vorley's and Chanu's Spoof Orders were often placed within 5 ticks behind the best price so as to reduce the likelihood of them being filled. The Spoof Orders also were typically at least 10 lots, and were often placed and cancelled within a 5 second window.

27.     Vorley and Chanu intended to cancel the Spoof Orders before execution, and often did so after their Genuine Orders were filled.

28.     Vorley and Chanu's Scheme involved sending false signals to the market that they wanted to buy or sell the number of contracts in their Spoof Orders. In reality, Vorley and Chanu did not want their Spoof Orders to execute; rather, at the time they placed the Spoof

7

Orders, Vorley and Chanu intended to cancel them before execution. Vorley and Chanu used the Spoof Orders as a means of tricking other market participants into executing against their Genuine Orders.

29. Vorley and Chanu's Scheme was designed to benefit financially from market participants' reactions to their Spoof Orders. The following is a simplified explanation of how their Scheme was intended to work, using a hypothetical example of a Spoof Order on the buy side. A large Spoof Order to buy would result in an increase in demand in the order book (i.e., create or add to an order book imbalance in which orders to buy outweigh orders to sell). This increase would be visible to other market participants and may lead them to conclude that the price is likely to rise. This conclusion, in turn, would impact market participants' decisions, including prompting some to attempt to purchase contracts before the predicted rise in price happens. In such a case, these participants would place aggressive orders to buy (i.e., at a higher price than the currently resting bids in the market), making execution of orders resting on the opposite side of the Spoof Order more likely. Finally, these bids would enable orders on the opposite side of the Spoof Order—including Vorley and Chanu's Genuine Orders—to sell sooner, at a better price, or in larger quantities than they otherwise would.

30. By engaging in the Scheme as described herein, Vorley entered Spoof Orders to intentionally send a false signal to the market that he actually wanted to buy or sell the number of contracts specified in the Spoof Orders, or did so while recklessly disregarding the fact that entering his Spoof Orders would send such a false signal—a signal that injected false information about supply and demand into the market that could affect market activity. Vorley engaged in this Scheme to trick other market participants into executing against his or his colleagues' Genuine Orders on the opposite side of the market—allowing them to fill sooner, at a

better price, or in larger quantities than they otherwise would.  Vorley knew or recklessly disregarded that the Spoof Orders would create the false appearance of market depth and result in misinformation, thereby luring market participants to trade based on Vorley's spoofing.  The risk that the Spoof Orders could mislead other market participants into believing there was genuine interest in purchasing or selling the specified number of contracts represented by Vorley's Spoof Orders was so obvious that Vorley must have been aware of it.  He knew that his Spoof Orders would appear in the Order Book and that traders often consider order-book information in making trading decisions; thus, Vorley was, at least, reckless with respect to the danger that his Spoof Orders would mislead other market participants.

31. By engaging in the Scheme as described herein, Chanu entered Spoof Orders to intentionally send a false signal to the market that he actually wanted to buy or sell the number of contracts specified in the Spoof Orders, or did so while recklessly disregarding the fact that entering his Spoof Orders would send such a false signal—a signal that injected false information about supply and demand into the market that could affect market activity.  Chanu engaged in this Scheme to trick other market participants into executing against his or his colleagues' Genuine Orders on the opposite side of the market—allowing them to fill sooner, at a better price, or in larger quantities than they otherwise would.  Chanu knew or recklessly disregarded that the Spoof Orders would create the false appearance of market depth and result in misinformation, thereby luring market participants to trade based on Chanu's spoofing.  The risk that the Spoof Orders could mislead other market participants into believing there was genuine interest in purchasing or selling the specified number of contracts represented by Chanu's Spoof Orders was so obvious that Chanu must have been aware of it.  He knew that his Spoof Orders would appear in the Order Book and that traders often consider order-book

information in making trading decisions; thus, Chanu was, at least, reckless with respect to the danger that his Spoof Orders would mislead other market participants.

32. In or about July 2009, Bank A hired Trader A onto Bank A's precious metals trading desk in Singapore. Trader A remained a trader on the desk until approximately February 2012. Over his several months on the desk, Trader A observed Vorley and Chanu's trading.[1] Specifically, Trader A observed Vorley and Chanu spoof. According to Trader A, the trading patterns described above in paragraph 26 were consistent with spoofing.

33. Trader A explained the Scheme in an electronic chat with Trader B, a trader at another financial institution, Bank B, on March 28, 2011. At approximately 10:54 p.m.[2] Trader A said: "basically i sold out . . . just by having fake bids . . . [in] the futures . . . i just spam bids below . . . to clear my offer." The "fake bids" and "spam bids" that Trader A referred to were Spoof Orders. Shortly before making those statements, Trader A placed a Genuine Order as an Iceberg Order to sell at 10:43:34 p.m. in Silver Futures for 20 lots, with 1 lot as the visible quantity. After that order failed to continue filling for 2 minutes and 30 seconds, Trader A began quickly placing and cancelling a series of 21 Spoof Orders to buy for a total of 220 lots in order to get his sell order filled. The Spoof Orders were typically cancelled within 1 or 2 seconds. At 10:54:12 p.m. Trader A filled the 20th contract of his original sell order and cancelled the remaining Spoof Orders.

34. During the period that Vorley and Chanu were teaching Trader A how to spoof, Vorley and Chanu frequently spoofed. For example, on March 16, 2011, Vorley wrote to another trader at Bank A that he was "spoofing it up . . . ahem ahem." On that day, Vorley was

---

[1] The bank's trading technology enabled traders on the precious metals desk to see each other's trading activity in real time across all three desk locations.
[2] Unless otherwise noted, times referenced are in the Central time zone.

attempting to fill a 56-lot Genuine Order as an Iceberg Order to sell with 1 lot showing in Gold Futures.  Immediately after placing the 56-lot sell order at 6:03:21 a.m., Vorley placed 12 buy Spoof Orders over the following 5 seconds each for 10 lots, for a total of 120 lots that were subsequently cancelled within 1 to 2 seconds each.  The Genuine Order continued to fill during and after the cancellation of the Spoof Orders.

      35.     In addition to placing Spoof Orders to get their own Genuine Orders filled, as part of their Scheme, Vorley and Chanu also placed Spoof Orders to help fill Genuine Orders placed by each other as well as by other traders at Bank A, including Trader A.  At other times, Trader A would place Spoof Orders to help Vorley, Chanu or other traders at Bank A get their Genuine Orders filled.  This frequently happened when one of the traders would notice that a colleague's Genuine Order had "stalled," i.e., failed to fully fill shortly after being placed.  When that happened, Vorley, Chanu, Trader A or other traders on the desk would "help" their colleague by placing Spoof Orders opposite the stalled Genuine Order to create the false appearance of market depth and book pressure and result in misinformation designed to induce a market participant to fill the Genuine Order when that market participant otherwise might not have done so.

      36.     Chanu discussed the Scheme with another trader on the desk at Bank A, Trader C, in an electronic chat dated January 28, 2009.  Shortly after Trader C placed Spoof Orders to help Chanu attempt to fill his Genuine Order, Trader C said to Chanu "so glad i could help . . . got that up 2 bucks . . . hahahahah."  He continued: "that does show u how easy it is to manipulate so[me]times."  Chanu replied "yeah yeah of course."  Trader C continued: "that was alot of clicking," referring to the process of placing a series of Spoof Orders and quickly cancelling them.  Chanu replied: "basically you tricked alkll [sic] the algorythm," referring to the fact that Trader C's Spoof Orders had sent a false signal to the market and deceived other market

11

participants into transacting based on the false information, thereby allowing Chanu to obtain a favorable execution of the Genuine Order. Trader C stated "i know how to 'game' this stuff" and Chanu replied "THAT IS BRILLIANT." Trader C continued: "[I] f..k the mkt around a lot . . . not alot of people had it figgied out . . . that[']s why i love electronic trading."

37. In another example, on November 3, 2010, Trader A was attempting to sell 400 Gold Futures contracts but was not getting all of his Genuine Order (placed as an Iceberg Order) filled, even after dropping the price. Seeing that Trader A needed a fill, Vorley and Chanu placed a series of Spoof Orders to buy that they then cancelled after approximately two seconds each, in an effort to help Trader A fill his Genuine Order. Specifically, Vorley submitted and cancelled 29 buy orders at 10 contracts each. Following this activity, Trader A writes in an electronic chat to Vorley "classic jam it . . . tricks from the master."

38. Vorley, Chanu and the other traders on the desk continued their Scheme into 2012. For example, on January 6, 2012 at 1:59:04.221, Trader A placed a 20 lot, Gold Futures Genuine Order to sell as an Iceberg Order with 1 lot visible to the market. The Genuine Order executed 13 lots after approximately 6 seconds, but then stalled. After stalling for approximately 8 seconds, Chanu placed 9 Spoof Orders to buy starting at 1:59:18.668, 8 for 10 lots and one for 50 lots, for a total of 130 lots. Chanu cancelled all of these orders in less than 5 seconds. One second after Chanu finished cancelling all of his Spoof Orders, Trader A received a 1-lot fill on his Genuine Order.

39. On June 6, 2012 at 1:26:57.520, Vorley placed a 30 lot, Gold Futures Genuine Order to sell as an Iceberg Order with 1 lot visible to the market. The order immediately executed 20 lots, however, it stalled for almost 12 seconds. Chanu then placed 8 Spoof Orders to buy, 10 lots each, for a total of 80 lots starting at 1:27:09.320 in order to spoof the market.

While most of the Spoof Orders were pending, 8 additional lots of Vorley's Genuine Offer executed. Chanu placed and cancelled each of the Spoof Orders within 5 seconds. Shortly after Chanu finished cancelling his Spoof Orders, Vorley's remaining 2 lots of his Genuine Order executed so that he was fully filled.

### C. Vorley And Chanu Continued Their Manipulative and Deceptive Scheme Through 2013

#### 1. *January 28, 2013 Spoofing*

40. Vorley and Chanu continued their Scheme into 2013. For example, on January 28, 2013, at approximately 15:32:43.198, Vorley placed a 34-lot Genuine Order as an Iceberg Order to show 1 lot to the market, to buy Gold Futures at $1655.20.

41. After approximately 30 seconds during which the Genuine Order did not fill, at 15:33:12.415, Vorley placed a 110-lot Spoof Order, to sell Gold Futures at $1655.70 that he intended to cancel before execution. The 110-lot order was placed 3 ticks away from the best offer at the time of placement.

42. Before the Spoof Order was placed, the market was relatively balanced, with 13% more offers than bids. As a result of the Spoof Order, the market became one where there were 96% more offers than bids.

43. Approximately 1 second after the Spoof Order to sell was placed, the Genuine Order to buy begins to fill rapidly, 1 lot at a time, until all 34 lots fill over the course of a few milliseconds.

44. Approximately 1.6 seconds after the last lot of the Genuine Order filled, Vorley cancelled the 110-lot Spoof Order to sell in its entirety. That Spoof Order was on the market for an overall time of just under 3 seconds.

### 2. *May 23, 2013 Spoofing*

45. On May 23, 2013, at 1:05:45.122, Chanu placed a 96-lot Genuine Order that was an Iceberg Order showing 1 lot to the market to buy June delivery Gold Futures at $1374.10. At the time, $1374.10 was 5 ticks off of the best bid in the market.

46. The Genuine Order continued to sit unfilled and then at 01:07:55.630, Chanu placed a 100-lot Spoof Order 2 ticks away from the best offer to sell June delivery Gold Futures at $1374.60, which he intended to cancel before execution.

47. Just before placing the 100-lot Spoof Order, the visible volume on the offer side was 62 contracts with no price level exceeding 15 contracts. Chanu's 100-lot offer more than doubled the visible volume on the offer side and almost doubled the visible bid volume.

48. Chanu's 1-lot Genuine Order to buy at $1374.10 was filled approximately 1.2 seconds after the placement of his 100-lot Spoof Order to sell, after pending in the market for over 2 minutes.

49. At 01:07:57.865, a half second after filling his Genuine Order, Chanu cancelled his 100-lot Spoof Order in its entirety.

### 3. *June 2, 2013 Spoofing*

50. On June 2, 2013, at 19:52:13.056, Chanu placed a 50-lot Genuine Order that was an Iceberg Order showing 1 lot to the market to sell August-delivery Gold Futures at $1395.60. At the time of placement, the Genuine Order was at the best price level.

51. The Genuine Order sat pending for over 3 minutes, at which point Chanu placed a 100-lot Spoof Order to buy August-delivery Gold Futures at $1395.3 that he intended to cancel before execution.

52. At the time of placement, the Spoof Order to buy was 1 tick away from the best bid.

53. At the time Chanu placed the 100-lot Spoof Order, the total visible buy-side order volume was 116 lots. His Spoof Order, therefore, increased the visible sell-side volume by almost 50%.

54. Almost immediately, Chanu's Genuine Order filled 3 contracts.

55. Approximately 1 second later, Chanu cancelled his 100-lot Spoof Order in its entirety.

### 4. *July 9, 2013 Spoofing*

56. On July 9, 2013, at 15:51:59.661, Vorley placed a 50-lot Genuine Order as an Iceberg Order showing 1 lot to the market, to sell Gold Futures at $1247.00.

57. Almost immediately, 10 lots of the sell order filled. Then approximately 5 seconds passed without further fills, so Vorley placed a 100-lot Spoof Order to buy Gold Futures at $1246.80 that he intended to cancel before execution.

58. At the time the Spoof Order was placed, the market was slightly imbalanced, with 58% more bids than offers. As a result of the Spoof Order, the market became one where the Order Book had 207% more bids than offers.

59. Almost immediately after the Spoof Order to buy was placed, within 3 milliseconds, 8 additional lots filled from the Genuine Order.

60. Less than a second after the 8th lot of the Genuine Order to sell was filled, Vorley cancelled the 100-lot Spoof Order to buy in its entirety. The Spoof Order was on the market for approximately 7 tenths of a second.

15

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I

**VIOLATION OF SECTION 4c(a)(5)(C) OF THE ACT,
7 U.S.C. § 6c(a)(5)(C)
(DISRUPTIVE PRACTICES - SPOOFING)**

61. Paragraphs 1 to 60 are re-alleged and incorporated herein by reference.

62. By reason of the conduct described above, for the time period beginning in approximately July 2011 and continuing to at least July 2013, Vorley and Chanu engaged in trading, practices, or conduct on or subject to the rules of a registered entity that is, is of the character of, or is commonly known to the trade as, "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution).

63. In placing each Spoof Order, Vorley and Chanu acted with intent to cancel the bid or offer before execution.

64. By reason of the foregoing, Vorley and Chanu violated Section 4c(a)(5) of the Act, 7 U.S.C. § 6c(a)(5) (2012).[3]

65. Each Spoof Order constitutes a separate and distinct violation of Section 4c(a)(5)(C) of the Act.

### COUNT II

**VIOLATION OF SECTION 6(c)(1) OF THE ACT, 7 U.S.C. § 9(1),
AND REGULATION 180.1(a)(1) AND (3), 17 C.F.R. § 180.1(a)(1), (3)**

**Use of a Manipulative and Deceptive Device, Scheme, or Artifice**

66. Paragraphs 1 to 60 are re-alleged and incorporated herein by reference.

67. By reason of the conduct described above, for the time period beginning in approximately August 2011 and continuing to at least July 2013, Vorley and Chanu, in

---

[3] Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012), became effective on July 16, 2011.

connection with a contract for future delivery on a registered entity, intentionally or recklessly: (1) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices to defraud; or (2) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon market participants.

68. Vorley and Chanu acted intentionally or recklessly.

69. By reason of the foregoing, Vorley and Chanu violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2017).[4]

## VI. RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, as amended, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A. An order finding that Vorley and Chanu are liable for violating Sections 4c(a)(5)(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(a)(5)(C) and 9(1) (2012), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2017);

B. An order of permanent injunction restraining and enjoining Vorley and Chanu, and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert with them who receive actual notice of such order by personal service or otherwise, from directly or indirectly violating Section 4c(a)(5)(C) and 6(c)(1) of the Act and Regulation 180.1(a)(1) and (3);

C. An order of permanent injunction restraining Vorley and Chanu and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert with them from:

---

[4] Commission Regulation 180.1, 17 C.F.R. § 180.1 (2017), became effective on August 15, 2011.

1. Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

2. Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2014)) for their own personal accounts or for any account in which they have a direct or indirect interest;

3. Having any commodity interests traded on their behalf;

4. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5. Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2014); and/or

7. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2014)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2014).

D. An order directing Vorley and Chanu to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584 (2015), title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2017) for each violation of the Act, as described herein;

E. An order providing for such other and further remedial and ancillary relief, including, but not limited to, disgorgement, as this Court may deem necessary and appropriate;

  F. An order requiring Vorley and Chanu to pay costs and fees, as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

  G. An order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

## VII. JURY DEMAND

  Plaintiff hereby demands a trial by jury.

Dated: January 26, 2018         Respectfully submitted by,

| | |
|---|---|
| */s/ Brigitte Weyls*_____ | */s/ Katie Rasor*_____ |
| Brigitte Weyls (Local Counsel) | Katie Rasor |
| Trial Attorney | Trial Attorney |
| | |
| Barry Blankfield (Local Counsel) | Patryk J. Chudy |
| Trial Attorney | Chief Trial Attorney |
| | |
| | Manal M. Sultan |
| | Deputy Director |
| | |
| Commodity Futures Trading Commission | Commodity Futures Trading Commission |
| Division of Enforcement | Division of Enforcement |
| 525 West Monroe, Suite 1100 | 140 Broadway, 19th Floor |
| Chicago, IL 60661 | New York, New York 10005 |
| Phone: (312) 596-0700 | Phone: (646) 746-9700 |
| bweyls@cftc.gov | krasor@cftc.gov |
| bblankfield@cftc.gov | pchudy@cftc.gov |
| | msultan@cftc.gov |